CHASEZ, Judge.
This is an appeal from a judgment dissolving writs of sequestration and attachment, which writs had been issued at the instance of the plaintiff herein, Econo-Car International, Inc. The facts involved are set forth in plaintiff-appellant’s brief, which was stipulated as correct for purposes of this appeal by the defendants in their brief. We quote at length:
“Plaintiff-Appellant, Econo-Car International, Inc., by agreement dated April 3, 1963, granted to one of the defendants herein, Mrs. Grace Zimmermann, an exclusive automobile rental franchise. * * * Although defendant Kenneth J. Zimmermann, husband of Mrs. Grace Zimmermann, was not a party to the franchise agreement, plaintiff has averred that he acquiesced and assisted his wife in the operation of the business, ratified the obligations which she undertook therein and accepted it as a community obligation.
“The Plaintiff further averred that subsequent to the execution of the agreement, defendants formed a closed corporation called Three Ninety-Nine Econo-car of New Orleans, Inc. to which they assigned all of their right, title and interest in and to the franchise agreement.
“For the above reasons the suit herein was instituted against Mrs. Zimmermann, Kenneth J. Zimmermann, and Three Ninety-Nine Econocar of New Orleans, Inc.
“In order to provide its franchise holders with automobiles, plaintiff, as a stand *190 ard business procedure, would lease new model automobiles from Chrysler Corporation, and would in turn sublease the automobiles to its franchise holders.
“This standard business practice was carried forth between the parties to this suit and from the period November 19, 1964 through March 26, 1965, plaintiff delivered and defendants accepted thirty-four (34) 1965 model automobiles, * *.
“The agreed rental for the sublease of the vehicles is set forth in Paragraph 8 of plaintiff’s petition and represents a total monthly rental of Four Thousand Five Hundred Seventy-Six and 56/100 ($4,576.56) Dollars.
“At the time suit herein was instituted, plaintiff averred that defendants breached their lease obligations and franchise agreement by defaulting in payment of the agreed lease rentals, by failing to return the vehicles despite demand and that as of the date of filing of suit, defendants were in default on lease rentals in the amount of Eighteen Thousand and no/100 ($18,000.00) Dollars. (Paragraph 9, plaintiff’s petition)
“On these facts, plaintiff averred that it had a lessor’s privilege on the vehicles, that the vehicles were being depreciated considerably from day to day, and that its privilege would be lost unless a writ of sequestration issued. Accordingly, a writ of sequestration did issue, without bond.
“Additionally, plaintiff averred that defendants were about to dispose of their property, or some part thereof, with the intent to defraud plaintiff, and prayed for and obtained a writ of attachment against certain checking accounts which defendants had with the National Bank of Commerce. Under these allegations, a writ of attachment issued with bond in the amount of Eighteen Thousand and no/100 ($18,000.00) Dollars.
“Under the writ of sequestration based on the lessor’s privilege, the Civil Sheriff for the Parish of Orleans proceeded to seize the subject automobiles. Between the dates of August 23, 1965 and September 10, 1965 the Sheriff succeeded in seizing thirty-one (31) of the automobiles. Following the lapse of ten (10) days from the respective dates of seizures of the automobiles, plaintiff, * * * acquired possession of the vehicles by bonding the sequestration.
“Under the writ of attachment, the Civil Sheriff for the Parish of Orleans seized a checking account in the name of Kenneth J. or Grace H. Zimmermann with a balance of Twenty-Six and 55/100 ($26.55) Dollars, another checking account in the name of Three Ninety-Nine Econocar of New Orleans, Inc. with a balance of Seven Hundred Sixty-One and 35/100 ($761.35) Dollars, and a savings account in the name of Mrs. Grace Zim-mermann with the balance of Two and 82/100 ($2.82) Dollars, all of the said accounts being with the National Bank of Commerce in New Orleans.
“On June 24, 1966, some ten months following the date of issuance of the writ of sequestration and attachment, defendants moved for dissolution of the writ of sequestration and attachment.
“Following the hearing of the motion, the Lower Court recalled and dissolved both writs, and plaintiff perfected this appeal from the latter judgment.”
We will first inquire into the judgment dated July 28, 1966 as regards the writ of sequestration. The grounds for the issuance of a writ of sequestration are set forth in Article 3571 of the Louisiana Code of Civil Procedure:
“When one claims the ownership or right to possession of property, or a mortgage, lien, or privilege thereon, he may have the property seized under a writ of sequestration, if it is within the power ■of the defendant to conceal, dispose of, or waste the property or the revenues therefrom, or remove the property from *191 the parish, during the pendency of the action.”
In addition, C.C.P. Article 3575 provides that “A writ of sequestration to enforce a lessor’s privilege shall issue without the furnishing of security”, as was done in this case. The writ was issued pursuant to the following allegations:
“10.
“Plaintiff has a lessor’s privilege on the vehicles.
“11.
“Petitioner avers that the automobiles are being depreciated considerably from day to day, and has good reason to believe that defendants will remove the vehicles on which petitioner has a lessor’s privilege and that your petitioner will be deprived of his privilege unless a writ of sequestration issues herein.”
And the plaintiff prayed for the issuance of the writ in accordance with C.C.P. Article 3575, quoted above, and C.C.P. Article 3572, which reads:
“A sequestration based upon a lessor’s privilege may be obtained before the rent is due, if the lessor has good reason to believe that the lessee will remove the property subject to the lessor’s privilege. If the rent is paid when it becomes due, the costs shall be paid by the plaintiff.”
The point argued below and here is the question: Does the sublessor of movables have a privilege over the movables which are the object of the lease for the rent due on the lease of the movables? The question is res nova, and the Court below decided that no such privilege existed. In this conclusion we entirely agree. The articles of the Civil Code which grant a privilege to the lessor for rent due are:
“Art. 3217. The debts which are privileged on certain movables, are the following:
‡ ‡ ‡ sjc ije
3. The rents of immovables and the wages of laborers employed in working the same, on the crops of the year, and on the furniture, which is found in the house let, or on the farm, and on every thing which serves to the working of the farm.”
“Art. 3218. The right which the lessor has over the products of the estate, and on the movables which are found on the place leased, for his rent, is of a higher nature than mere privilege. The latter is only enforced on the price arising from the sale of movables to which it applies. It does not enable the creditor to take or keep the effects themselves specially. The lessor, on the contrary, may take the effects themselves and retain them until he is paid.”
“Art. 3219. The privilege of the lessor is enforced on the property subject to it, in the manner described in the title: Of Lease."
“Art. 2705. The lessor has, for the payment of his rent, and other obligations of the lease, a right of pledge on the movable effects of the lessee, which are found on the property leased.”
“In the case of predial estates, this right embraces everything that serves for the labors of the farm, the furniture of the lessee’s house, and the fruits produced during the lease of the land; and in the case of houses and other edifices, it includes the furniture of the lessee, and the merchandise contained in the house or apartment, if it be a store or shop.
“But the lessee shall be entitled to retain, out of the property subjected by law to the lessor’s privilege, his clothes and linen, and those of his wife and family; his bed, bedding and bedstead, and those of his wife and family; his arms, military accoutrements, and the tools and instruments necessary for the exercise of the trade or profession by which he gains his living and that of his family; one *192 cooking stove and utensils of said stove; plates, dishes, knives, forks and spoons; all pots, pans and other cooking utensils; one dining table, and dining chairs necessary for himself and family.”
“Art. 2706. This right of pledge includes, not only the effects of the principal lessee or tenant, but those of the undertenant, so far as the latter is indebted to the principal lessee, at the time when the proprietor chooses to exercise his right.
“A payment made in anticipation, by the undertenant to his principal, does not release him from the owner’s claim.”
“Art. 2707. This right of pledge affects, not only the movables of the lessee and underlessee, but also those belonging to third persons, when their goods are contained in the house or store, by their own consent, express or implied.”
The appellant, while admitting that the articles do not state specifically that the lessor’s privilege does appertain to a movable object of lease, urges the Court not to interpret their language so rigidly as not to give them the meaning that the lawmakers intended, and argues that it would be anomalous to accord the privilege in the broad fashion allowed in C.C. Article 2707, but to disallow it against the property which is the very object.of the lease.
However in Louisiana, privileges are statutory and cannot be recognized except as given by statute. C.C. Article 3185. Boylan’s Detective A. & P. Police v. Arthur A. Brown & Co., 157 La. 325, 102 So. 417 (1924). Moreover, such privileges are stricti juris; they must be strictly construed, and any ambiguity in the statute should be resolved against the one claiming the privilege. See Jackson Homestead Ass’n v. Zimmer, 16 La.App. 647, 134 So. 126 (1931).
The law, as written, gives a privilege to the lessor only on movables found on the leased premise's. There is no anomaly in this result. The lawmakers obviously intended to give a privilege over the movables of a third party present in “the house or store; by their own consent” and did not conceive of granting a privilege over a movable, the object of the lease, and under the rules governing privilege, we cannot create such a privilege.
The writ of attachment was dissolved after a hearing of the evidence in support of plaintiff’s allegation on which the attachment was based:
“12.
“Defendants are about to dispose of their property or some part thereof with intent to defraud your petitioner and that defendant intend to place certain funds presently owned by them beyond the reach of their creditors, before a Judgment can be obtained and issued against them, and petitioner is entitled to and desires the issuance of a Writ of Attachment.”
Plaintiff-appellant argues that the writ was proper under C.C.P. Article 3541 which provides:
“A writ of attachment may be obtained when the defendant:
******
(2) Has mortgaged, assigned, or disposed of his property or some part thereof, or is about to do any of these acts, with intent to defraud his creditors or give an unfair preference to one or more of them;
(3) Has converted or is about to convert his property into money or evidences of debt, with intent to place it beyond the reach of his creditors;”

We find ourselves in agreement with the trial Court again, in that the evidence adduced was insufficient to disclose that the defendant has performed any *193 act with reference to his property with the intention of defrauding his creditors or giving an unfair preference to any other creditor. The following testimony of Mr. Zimmermann was the only proof offered to establish any such intent on the part of the defendants:
“Q. Now, is it not a fact, Mr. Zimmer-mann, that you were suppose (sic) to pay a certain amount per month to Econo-Car International on those same vehicles that you were renting to customers?
A. Yes, with question as to the rate being charged, due to the differential of the charges in the original contracts and the fluctuation and increase in rates; plus the fact that proper credits, such as advertising, other items such as prices-guaranteed plans which were not passed back to us, we paid the amounts of money to the company as interpreted through our bookkeeping system, which Mrs. Zimmermann did.
Q. When was the last time you made any payment to Econo-Car International ?
A. In July, ’65, approximately the amount of three thousand dollars.
Q. Did you make any payment in August of ’65?
A. We had made a trip to Daytona to—
Q. Answer my question first, please. Did you make any payments in August of ’65?
A. No.
Q. But you had been receiving revenues from the same automobiles that you were renting to the public, is that right?
A. Yes sir.
Q. And the revenues that you received from rentals to the public, could you tell me what was done with those revenues?
A. They were deposited in the National Bank of Commerce.
Q. Do you know the amount of revenues received by you in August of ’65?
A. No sir, due to the fact that when the cars were seized many of the accounts receivable people refused to pay, and we’ve been unable to collect, and these receivables, I would say, amount to six, seven thousand dollars.”
******
BY MR. KRONLAGE:
“Q. My question was, Mr. Zimmer-mann, is it not a fact that the funds you collected from the public were to be allocated to Econo-Car International for the payment of their rental ?
A. Yes sir, but as I also stated before, when you partook of the action of seizing this business the accounts receivable, which we have been unable to collect, which would have been transferred to you, have not been able, as I said, we have not been able to collect them.
Q. How much were you receiving per day for the rental of the vehicles?
A. This varied upon the vehicle.
Q. What was the lowest and what was the highest?
A. The lowest rate you could get was $3.99.
Q. Per day ?
A. That’s right, sir.
*194 Q. And you had approximately thirty vehicles that you were renting, is that correct?
A. We had thirty vehicles. This does not mean we were renting thirty.
Q. You say all the funds that you received for rentals during the month of July were deposited to the Econo-Car of New Orleans account?
A. That’s right, sir.
Q. And isn’t it a fact that for the month of July you received far in excess of seven hundred and sixty dollars of revenues from the cars that you rented?
A. Some of this again, sir, was accounts receivable. The answer to that question would be yes.
Q. But none of that was paid to Econo-Car International for the payments that were due on August 1st?
A. I would have to look into our series of checks and so forth, because the question of payment reverts back to the question of what was the rate that was suppose (sic) to be charged us according to the original contract.
Q. I realize that, sir, but you testified earlier that for the month of August there was no payment made, and the payments were due on August 1st, weren’t they?
A. Yes sir.”
* * * * *
BY MR. GAMBLE:
“Q. Mr. Zimmermann, is a large portion of your business, when you were conducting this business in July and August of this year, was a large portion of your business credit business ?
A. Yes sir.
Q. Were checks drawn periodically on the 399 Econo-Car account during those months to pay operating expenses ?
A. Yes sir.”
This is the substance of the plaintiff’s evidence, and we are convinced that an intent to defraud was not present.
The record discloses that Blaise Parking Service intervened in the action below. The judgment of July 28, 1965 contained the following:
% # ‡ ‡
“IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the lien and privilege of Blaise Parking Service on the property herein seized and sequestered be recognized and maintained for which a bond has been posted in these proceedings; * *

There seems to be no dispute as to this conclusion of the Court among the parties. The judgment below is therefore affirmed and the appellant is to bear the costs.
Affirmed.